[Civ. No. 16195.  First Dist., Div. One.  Apr. 21, 1955.]

JEWEL L. GOULD, Appellant, v. LOUIS T. SAMUELS
et al., Respondents.

Frank J. Perry and George Olshausen for Appellant.

Sullivan, Roche, Johnson & Farraher and Albert E. Polonsky for Respondents.

PETERS, P. J.—This action for the alleged mishandling of the sale and proceeds of the sale of the Worth Hotel, was brought by H. W. and Jewel L. Gould, husband and wife, against Louis T. Samuels and Helen Frederick, real estate brokers, and against Max Stern, the Title Insurance and Guaranty Company, and the City Title Insurance Company. It is alleged in the amended and supplemental complaint that the brokers negligently and wrongfully sold the hotel, formerly owned by the Goulds, for $200,000, when its real value was $221,500. Defendant Frederick cross-complained for $5,000 claimed to be due her for commissions. H. W. Gould

then died, and a second supplemental complaint was filed by Jewel L. Gould, individually and as trustee for Janet L. Gould. During trial, by stipulation, nonsuits were granted in the trustee action, and as to the defendant City Title Insurance Company. Before trial the action was dismissed as to defendants Max Stern and the Title Insurance and Guaranty Company. Thus, the cause proceeded to trial with Jewel L. Gould as plaintiff, and Louis T. Samuels and Helen Frederick, as defendants. The jury decided that plaintiff was entitled to nothing against these defendants, and that defendant Mrs. Frederick was not entitled to recover on her cross-complaint. From the judgment entered in favor of Samuels and Frederick the plaintiff appeals. Her main contentions are that the trial court committed prejudicial error in the giving and in the refusal to give certain instructions, and in its ruling excluding a certain piece of evidence.

H. W. Gould was a mining engineer, who also bought and sold real estate. He purchased the Worth Hotel in September of 1946. In March of 1947 he gave written authority for a period of 30 days to defendant Frederick, who had been his real estate broker for ten years, to sell the hotel for $221,500 net to him, and also to sell a certain building owned by him in Oakland. Mrs. Frederick approached Samuels, also a broker, for advice in reference to the deal. Samuels told Mrs. Frederick that the hotel could not sell for over $200,000.

Gould was anxious to sell the hotel. Mrs. Frederick first offered it for sale for cash at the price fixed by Gould, but was unable to find a buyer. Gould then contemplated an exchange. He was shown several buildings, but no exchange was consummated. In April of 1947 Mrs. Frederick suggested to Gould the Battery-Jackson Building for exchange purposes. This building was owned by one Heskins. Gould was very much interested and directed Mrs. Frederick to try to arrange an exchange. Samuels continuously told Mrs. Frederick that neither for cash nor in an exchange could $220,000 be secured for the hotel, and was assured by her that Gould knew that and to try to effectuate a good exchange.

On May 1, 1947, Gould addressed a letter to Mrs. Frederick and Samuels in which he stated:

"We agree to consummate the following exchange agreement:

"We will take title to the NW corner of Battery and Jackson, subject to a new Ten (10) year Life Insurance loan in the

sum of One Hundred Twenty-Five Thousand and no/100 Dollars ~~($125,000.00)~~, $150,000 . . .

"And

"In lieu thereof—We will give a deed to the Worth Hotel . . . subject to the amount of existing encumbrance at the date of transfer. . . .

"In addition to the above equity, we will pay the sum of Seventy Thousand and no/100 Dollars ~~($70,000.00)~~ $45,000 . . .

"If we desire to handle the above transaction in the manner of an exchange, you are to cooperate with us so that the deal can be closed on said lines. . . .

"We will pay to your joint offices the sum of Five Thousand and no/100 Dollars ($5,000.00) as commission for services rendered."

Mrs. Frederick testified that when this letter was prepared the price of $221,500 for the Worth Hotel was no longer in effect; that by that date Gould and the brokers had agreed to try to effectuate an exchange; that in the proposed trade no price was being placed on either building; and that Gould knew all of these facts.

Heskins, owner of the Battery-Jackson property, was not willing to make the exchange on the terms offered, because he wanted cash for his interest. Thus, it was obvious to all, including Gould, that to effectuate the exchange it would be necessary to "cash out" the Worth Hotel, that is, sell it at a quick sale for cash in order to pay Heskins and so as to get money for the brokers' commissions. Mrs. Frederick told Gould that this was so, and he directed her to make every effort to sell the Worth Hotel as part of the exchange transaction. In order to acquire the Battery-Jackson property Gould intended to assume the $150,000 encumbrance on it, use the $45,000 received from the sale of his Oakland property, and use $40,000 in cash which was the amount that he hoped to secure from the sale of his equity in the Worth Hotel. Mrs. Frederick testified that Gould was unwilling to put up any more money. In other words, Gould intended to get enough out of the sale of the Worth Hotel to complete the Battery-Jackson exchange.

In May of 1947 Heskins issued instructions to the City Title Insurance Company setting forth the terms on which he was willing to sell the Battery-Jackson property to Gould. Shortly thereafter, Gould executed a deed to the Worth Hotel naming the City Title Insurance Company as trustee, instructing the

trustee to convey the hotel at defendants' instructions. Gould did this because he was going on a vacation and desired to give defendants the power and ability to complete the transaction.

Late in May of 1947, defendants, in pursuance of their plan, known to all, to "cash out" the hotel, entered into an agreement to sell it to one Williams for $190,000, the purchaser agreeing to exchange certain property and to pay $40,000 by check. Mrs. Frederick told Gould about the proposed sale, and he was agreeable. Gould then, as part of the Battery-Jackson deal, executed notes in the sum of $150,000, and deposited them, some cash, and the $40,000 Williams' check, in the escrow of the Battery-Jackson transaction. This escrow was to be closed upon the arrival of $45,000 from the sale of the Oakland property. Before this occurred, however, it was discovered that there were not sufficient funds in the bank to cover the Williams' check, so that the sale to Williams failed. Defendant Samuels, thereupon, put up $40,000 of his own money and security in order to close the deal. Mrs. Frederick told Gould that Samuels was putting up the money to close the deal. Gould wanted the transaction closed, and instructed Mrs. Frederick to close it on these terms. On June 26, 1947, the transaction involving the Battery-Jackson property was completed.

Both defendants testified that this terminated Gould's interest in the Worth Hotel, because Gould had received all he bargained for when he secured the Battery-Jackson property. Gould, in his deposition, stated that he sold the hotel in June of 1947, and that from that date on he felt that he had no further interest in it. It is worthy of note that in July, 1947, certain repairs to the hotel were authorized and paid for by respondent Samuels.

On June 27, 1947, another person—Max Stern, a former owner of the hotel—came into the picture, by agreeing with Samuels to put up the $40,000 in place of Samuels. By the agreement between Stern and Samuels, and by the instructions to the City Title Insurance Company, it was provided that the hotel was to be deeded to Stern unless within 120 days a buyer was found for a price in excess of $177,000. In the meantime, Stern was to take over the management of the hotel and empowered to collect the rents. If a buyer was found Stern was to be paid $2,500, to come out of the commissions, and if a buyer was not found, and Stern, therefore, got the property, defendants' commissions totalling $12,500, were to be forfeited. Gould was told by Mrs. Frederick of this agree-

ment and Samuels was told that Gould knew about it. Defendants, who as yet had received no commissions, in an attempt to realize those commissions from a sale of the hotel, then made an effort to sell it. They listed it with various brokers, including one Milton Meyer, for $200,000, but no offers were secured. Meyer's office and another broker, Hammond by name, offered the hotel to Dr. Callison. When the doctor was informed that Samuels was involved he talked with him. Thereafter, Samuels handled the negotiations, but assured the doctor that Meyer and Hammond would be "recognized." Mrs. Frederick told Gould that Samuels, through Meyer, had a deal on the Worth Hotel, and that the purchaser was Dr. Callison. She also told him that they were trying to consummate the deal, and that Samuels-Meyers thought that the brokers should take smaller commissions. Gould replied that it was up to Mrs. Frederick to decide that question.

On July 11, 1947, Stern was paid off pursuant to the agreement, and the City Title Insurance Company was informed that any further instructions would come from Samuels. On July 25, 1947, the hotel was sold to Dr. Callison. Mrs. Frederick was given a $5,000 check by Samuels and she signed a release in settlement of a larger commission claimed by her. Gould was informed of the sale.

In the sale Dr. Callison assumed an encumbrance on the hotel, paid a substantial sum in cash, and turned over a lot valued at $33,500 for the purposes of the sale, but the actual value of which was $23,500. The stated selling price of the hotel was $200,000, but because of the intentional overvaluation of the lot the price was considered to be $190,000. Samuels took the lot and paid all commissions due in the transaction, except his own.

The experts opined that the fair market value of the hotel was $200,000, $180,000 to $185,000, $185,000 to $200,000, $190,000, $185,000 to $190,000 and $190,000. The "cash out" price was fixed at $185,000.

On this evidence the jury brought in a verdict adverse to plaintiff and denied any relief to Mrs. Frederick on her cross-complaint. From the judgment entered on that verdict plaintiff appeals.

The first contention made by appellant is that three instructions given by the trial court at the request of Samuels should not have been given. These instructions were as follows:

"An agent has such authority as the principal actually or ostensibly confers upon him."

"A principal is bound by the acts of his agent under a mere ostensible authority to those persons only who have in good faith and without want of ordinary care incurred a liability or parted with value upon the faith thereof."

"Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."

It is appellant's theory that both respondents were agents of Gould; that no third person was involved in the lawsuit; that such instructions relating to third persons must have misled the jury, and such error was prejudicial because the instructions were calculated to cause the jury to believe that a subagent was a third person. The instructions were proper under the evidence. Respondent Samuels in his answer and at the trial denied that he was the agent of Gould. Samuels contended, and his evidence showed, that he was Heskin's agent to sell the Battery-Jackson property, and that after that property was sold, Samuels represented himself and the other brokers in selling the Worth Hotel in order to realize the commissions from the proceeds of the sale of the hotel. Gould was by no means clear that Samuels was his agent. If Samuels was not Gould's agent, then he was a "third person" and entitled to rely on the ostensible authority of Mrs. Frederick, Gould's admitted agent. The instructions are, therefore, not subject to the challenge made by appellant.

It is probably true that the instruction last quoted above should not have been given because it seems to refer to situations in which a third person is suing a principal for the negligence of his agent, and obviously the present action does not involve such a controversy. That is so obvious that the instruction could not possibly have been prejudicial. (*Jacobs* v. *Bozzani Motors, Ltd.*, 109 Cal.App.2d 681 [241 P.2d 642]; *Marr* v. *Postal Union Life Ins. Co.*, 40 Cal.App. 2d 673 [105 P.2d 649].)

Appellant next objects to the giving of an instruction requested by Samuels stating the rule set forth in section 2320 of the Civil Code. The instruction was in the following language: "An agent has power to disobey instructions in deal-

ing with the subject of the agency in cases where it is clearly for the interest of his principal that he should do so and there is no time to communicate with the principal.''

Appellant argues that this instruction is not supported by the evidence in that there was no evidence that the agent's disobedience of instructions was for Gould's benefit, or that there was not time to communicate with Gould. The claimed disobedience is in selling the hotel for less than $221,500. It is quite doubtful that the evidence shows that either Mrs. Frederick or Samuels ever disobeyed any instructions of Gould, and therefore we agree that the instruction should not have been given. As we read the record it shows that Gould authorized Mrs. Frederick to sell the hotel for $221,500, but when no offers were received, entered into a new arrangement with her, that is, to exchange the hotel for the Battery-Jackson property, and when that failed, he authorized her to ''cash out'' the hotel at a price that would permit him to acquire the Battery-Jackson property. Moreover, Gould knew about, acquiesced in, and accepted the benefits of the activities of respondents with full knowledge of all the facts. This would seem to amount to a ratification of any unauthorized acts of respondents. (See 2 Cal.Jur.2d 765, § 101.) █ The most that can be said about the instruction is that it is very doubtful that there is any evidence of disobedience of instructions, and therefore it should not have been given. But an instruction implying that respondents may have disobeyed instructions, when there was no evidence of such disobedience, could only have harmed respondents. It could not have been prejudicial to appellant.

The trial court also gave an instruction, at the request of Samuels, to the effect that, as far as Samuels was concerned, the jury should first determine whether Samuels was the agent of Gould, and, if it was found that he was not, a verdict for this respondent should be rendered. This instruction is attacked on several grounds. It is first contended that the instruction prejudicially limited the question of Samuels' liability to agency when there are several other theories disclosed by the proof upon which Samuels could have been held liable.

Thus it is argued that if Samuels was not Gould's agent then he was not entitled to a commission, and such commission at least would be recoverable. It is also argued that if Samuels was not Gould's agent then he dealt with Gould's property as his own and is liable as for a conversion.

The difficulty with these two theories is that they are raised for the first time on appeal, are not embraced within the pleadings, were not raised in the trial court, and are not supported by the record.

The pleadings are based on the theory of agency, and the case was tried on the theory of agency. ■ An appellant is not permitted to change the theory of his case at the appellate level. (*Ernst* v. *Searle*, 218 Cal. 233 [22 P.2d 715]; *Schneider* v. *Henley*, 61 Cal.App. 758 [215 P. 1036]; *Marra* v. *Aetna Const. Co.*, 15 Cal.2d 375 [101 P.2d 490].) Moreover, appellant offered an instruction telling the jury that appellant's pleadings were based on the theory that both respondents while acting as brokers in the sale of the hotel and "in purported representation of the owners of the hotel," sold it for an improper sum. This instruction, as does the challenged one, limits Samuels' liability to a breach of agency. ■ It is, of course, the law that an appellant cannot complain "of an instruction given at his own request or of an error in an instruction given at the instance of his adversary when he requests a substantially similar one." (*Yolo Water & Power Co.* v. *Hudson*, 182 Cal. 48, 51 [186 P. 772]; see also *Jentick* v. *Pacific Gas & Elec. Co.*, 18 Cal.2d 117 [114 P.2d 343]; *George* v. *City of Los Angeles*, 51 Cal.App.2d 311 [124 P.2d 872]; *Lenning* v. *Chiolo*, 63 Cal.App.2d 511 [147 P.2d 410]; *Cedzo* v. *Bergen*, 53 Cal.App.2d 667 [128 P.2d 683]; *People* v. *Harlan*, 133 Cal. 16 [65 P. 9].)

Moreover, the theory in reference to the commission is contrary to the evidence. The record shows that the commission paid to Samuels was not paid by Gould. The total commission in the exchange of the properties was to be $12,500. Gould was to pay $5,000 of this for the sale of the hotel, and Heskins was to pay to Samuels $7,500 for the sale of the Battery-Jackson property to be retained out of $247,000 sale price for that property. But Gould paid to Heskins only the net price, less both commissions, for the Battery-Jackson property. Therefore, Mrs. Frederick and Samuels quite properly looked to the proceeds of the "cash out" sale of the Worth Hotel for the source of their commissions. Gould had already got all he had bargained for and his connection with the hotel had terminated.

■ The theory that if Samuels was not Gould's agent he should be held as for a conversion, a theory argued at some length, is just not supported by the evidence. There is no evidence that any dealings by Samuels were not with the

prior consent of Gould or his admitted agent Mrs. Frederick, or with his subsequent ratification, made with full knowledge of all the facts.

The contention that the instruction was erroneous because the evidence demonstrates, as a matter of law, that Samuels was Gould's agent requires but scant consideration. By his answer, and by his testimony Samuels denied that he was such an agent. His testimony supports the implied findings that he acted solely for Heskins in the sale of the Battery-Jackson property, and that after that sale was completed his activities in connection with the hotel were directed to the end of realizing his earned commission at a time that Gould's interest in the hotel had terminated.

█ The next major contention of appellant is that prejudicial error was committed in refusing to give several instructions offered by appellant. The first of these refers to the liability of brokers when they agree to pool commissions. It reads as follows: ''It is generally held that brokers representing the opposing sides to a negotiation who secretly agree, without the knowledge or sanction of their principals, to pool their respective commissions and divide them according to a prearranged plan, are not entitled to be compensated by their employers, and that the agreement between themselves is void and unenforceable as being contrary to public policy.''

The difficulty with this proffered instruction is that it assumes the existence of facts in respect to which the evidence was conflicting. It assumes that Samuels was the agent of Gould in the sale of the hotel, and it assumes that Samuels and the brokers for Dr. Callison secretly agreed, without the knowledge or consent of Gould or Dr. Callison, to pool the commissions. On both issues there was a conflict. Under such circumstances it was not error to refuse the instruction. (See many cases collected 24 Cal.Jur. p. 841, § 101.)

█ The court also refused to give the following instruction: ''In the event that you find that defendant Samuels assumed to act as broker and without knowledge or permission of Henry W. Gould and Jewel L. Gould actually dispose of their property consisting of the Worth Hotel, then defendant Samuels has no right to a commission on said transaction and that defendant should be given no credit for a commission on any accounting by him. His duty under such circumstances is to account for the fair market value of plaintiffs' property. The same rule is applicable toward de-

fendant Frederick if you find that she participated in such form of transaction.''

The trial court noted that this instruction was refused because ''Type of action (Negligence) constitutes an affirmance *pro tanto* of transaction. Omits element of condition or understanding under which conveyances to City Title Ins. Co. were made.''

The instruction would seem to be incomplete and misleading. Even if it be assumed that it correctly states the law as far as it goes (a point disputed by respondents), it fails to tell the jury that permission of Gould's agent would be equivalent to the permission of Gould, or that Gould's subsequent ratification with knowledge of all the facts would rectify the lack of prior consent. For this reason the instruction was properly refused.

Appellant complains of the failure to give the following instruction: ''You are instructed to bring in a verdict in favor of plaintiff in an amount to be determined by you representing the difference between the true market value of the equity of plaintiff and her husband in the Worth Hotel and the price obtained by the defendants on the sale herein involved.''

The trial court noted that this instruction was ''inapplicable under evidence.''

■ Since the proffered instruction was a direction of a verdict for appellant in a conflicting evidence situation, it was clearly incorrect. But appellant claims that this was the only instruction on the measure of damages that was offered, and no other on that subject was given. She, therefore, contends that this was error. No other instruction except the one quoted and properly refused was requested by appellant. ■ A party may not complain of a trial court's failure to instruct upon a subject upon which no proper instruction was requested. (*Bellon* v. *Silver Gate Theatres, Inc.,* 4 Cal.2d 1 [47 P.2d 462]; *Mills* v. *Los Angeles Junk Co.,* 3 Cal.App.2d 546 [40 P.2d 285]; *Potter* v. *Back Country Transp. Co.,* 33 Cal.App. 24 [164 P. 342]; *Maus* v. *Scavenger Protective Assn.,* 2 Cal.App.2d 624 [39 P.2d 209]; *Kuehn* v. *Lowthian,* 124 Cal.App.2d 867 [269 P.2d 666]; *O'Connor* v. *United Railroads,* 168 Cal. 43 [141 P. 809]; *Western States Gas & Elec. Co.* v. *Bayside Lbr. Co.,* 182 Cal. 140 [187 P. 735].) ■ There is no duty, in civil cases, for a trial court to give on its own motion instructions on issues not covered

470

by proffered instructions. Moreover, it should be pointed out that the jury found against appellant on the issue of liability, so that the failure to give the instruction on the measure of damages if liability were found would seem to be nonprejudicial.

The last major contention of appellant is that error was committed in excluding from evidence an undated, unsigned typed one-page paper relating to the sale of the hotel. This paper was offered as a claimed admission of Samuels. The parties stipulated that the document had been typed on a typewriter in Samuels' office. There was no other evidence of its authenticity, of its execution, or that Samuels authorized it or knew about it. Quite clearly the foundational proof was insufficient to warrant the introduction of the document as a letter under sections 1940 and 1942 of the Code of Civil Procedure. (See cases collected 18 Cal.Jur.2d p. 685, § 210.) The statutory requirements for the admission of the document as a business record were not met. (Code Civ. Proc., § 1953f.) There was no abuse of the power of the trial court in refusing to admit the paper on the proof made.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied May 20, 1955, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1955.