Charles GARY, Plaintiff-Respondent,

v.

FEDERAL BARGE LINES, INC., Defendant-Appellant.

No. 38016.

Missouri Court of Appeals, St. Louis District, Division Two.

April 26, 1977.

**610**

Thompson & Mitchell, Raymond L. Massey, St. Louis, for defendant-appellant.

Francis H. Kennedy, Jr., St. Louis, for plaintiff-respondent.

REINHARD, Judge.

Plaintiff Charles Gary brought this action seeking damages from defendant Federal Barge Lines, Inc., for injuries he received while working as a longshoreman upon a barge owned by defendant. A jury concluded that defendant's negligence was the cause of plaintiff's injuries, and assessed his damages in the amount of $8,000.00. Defendant has duly perfected its appeal from the judgment entered upon this verdict. The sole issue presented for our consideration is whether the trial court erred in denying defendant's motion for a directed verdict at the close of plaintiff's case. It is defendant's contention that plaintiff failed to present a submissible case of negligence under the amended Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* For reasons hereinafter stated we reject this contention, hold that a prima facie case of negligence against defendant was established, and affirm the judgment below.

Defendant acquired barge number CJ–1661 sometime in 1964 and utilized this barge from the day of its manufacture until the present. The barge's cargo compartments are protected by eight heavy steel hatch covers. Every hatch cover has rollers underneath which enable the longshoremen to move them forward or backward. The covers are fastened in place on the hull by means of a latching mechanism. Each cover has two "u" loops, approximately one inch wide and three to five inches long, attached to the side of the cover. When these two loops are aligned with a hole in the barge hull, a heavy iron pin (seven or eight inches long, one-half inch thick, and three and one-half to four inches wide) is inserted. This safety latch mechanism, when functioning properly, binds the hatch covers to the appropriate positions on the barge and prevents them from rolling to and fro on their rollers.

On February 12, 1973 plaintiff was working as a helper for Continental Grain Company at their docking facilities on the Mississippi River. Isaac Jackson also worked for Continental that day. As the lead man, Jackson's responsibilities included checking the hatch covers before loading began to see if they were fastened, opening the hatch covers and fastening them into place, and generally directing the loading of grain from Continental's dock into the barges "spotted" at the dock. Plaintiff's job simply required that he stand on the barge and control the flow of grain from the loading spout into the open compartment. He did not make, nor did his job require that he make, any inspection of the barge. During the morning of February 12 the men loaded one barge with grain and then awaited the arrival of defendant's barge CJ–1661. A tugboat brought the empty barge to Continental's dock shortly after the noon hour. It was tied to the dock so that it could be loaded with grain.

Jackson put his life-preserver on and went down to the barge with plaintiff. Jackson conducted a visual inspection of the barge and determined that all of the hatch covers were securely fastened. Hatch cover #3 was then unfastened, rolled back beneath cover #4, and fastened there. The open compartment was filled with grain and cover #3 was then unfastened, rolled back into place, and fastened again to its

original position. The men then opened up compartment #7 by moving hatch cover #7 beneath cover #8. The loading spout was placed over compartment #7 and plaintiff stood in the middle of hatch cover #6 while he directed the grain flow into the open compartment.

The barge gradually assumed an inclined posture from the cargo weight. The front of the barge reared up. Jackson heard a rumbling noise and saw hatch cover #3 break loose and roll downward towards plaintiff, who had his back to the onrushing danger. Jackson's exclamations went unnoticed due to the wind and plaintiff's proximity to the roaring grain chute. Cover #3 crshed into cover #4, which broke off and careened into cover #5. The swiftly moving hatch cover #5 struck plaintiff in the back of his lower legs as he stood on hatch cover #6. Plaintiff suffered a broken leg as a result of this impact.

After this accident, Jackson examined the latching mechanism for #3 and found the bottom loop broken off. He saw that this bottom loop has been welded but was rusted, and the weld formed a tenuous bond at that time. In fact, there was a crack in this weld, and this crack was not a fresh break. It is reasonable to assume that the tilting of the barge due to the increasing cargo forced hatch cover #3 to slide back, putting pressure on the safety pin nestled inside of the rusted loop. The weight of the hatch cover against the pin caused the defective loop to break off. The safety pin was then able to lean back and slip out of its hole in the barge hull since it was then held only by the top loop. When the pin slipped out of the hole the hatch cover rolled downward into hatch cover #4,

causing it to snap free. In turn, cover #4 rolled into cover #5, which broke free and collided with plaintiff.

Jackson's visual inspection of the barge prior to commencement of loading operations did not reveal anything unusual about the safety latches on cover #3. He did not see the rust on the bottom loop then, and in order to have seen the defect he would have had to lie on his stomach and look up. This would have been beyond the scope of his customary inspection. His job was only to look at the top. No one else inspected the barge at the dock that day, although defendant's inspectors had come there on prior occasions to inspect their barges. Defendant admitted that this barge was inspected on various occasions in St. Louis. No Continental Grain employee received any warning from defendant that the latching mechanisms on this barge were weak or loose.

These facts constitute a prima facie case of negligence against defendant. The applicable substantive law is the Federal Longshoremen's and Harbor Workers' Compensation Act, *supra*, and the cases construing it. The 1972 amendments to that act permit the longshoreman to bring an action against the vessel owner based upon negligence.[1] This cause of action is to be predicated upon a uniform federal standard. *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1237[1] (5th Cir. 1977); *Kelleher v. Empresa Hondurena de Vapores, S.A.*, 57 Cal.App.3d 52, 129 Cal.Rptr. 32, 35[3] (1976). In the interest of fulfilling the Congressional desire for uniformity, the federal courts have adopted the Restatement, Second, Torts formulations as the uniform guidelines for these actions.[2] *Gay*

1. 33 U.S.C. § 905(b), as amended, provides in pertinent part as follows:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel * * *. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of

persons engaged in providing stevedoring services to the vessel. * * * *The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.* The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." (Emphasis added.)

2. Restatement, Second, Torts § 343 states:

*v. Ocean Transport & Trading, Ltd., supra,* 546 F.2d at 1238[5]; *Anuszewski v. Dynamic Mariners Corp., Panama,* 540 F.2d 757, 759 (4th Cir. 1976); *Napoli v. Hellenic Lines,* 536 F.2d 505, 509 (2nd Cir. 1976).[3]

 The negligence standard in this case is guided by analogy to land-based negligence law concepts. The plaintiff, an employee of an independent stevedoring contractor, is regarded as a business invitee of the vessel owner-defendant. *Gay v. Ocean Transport & Trading, Ltd., supra,* 546 F.2d at 1237–1238[3]; *Anuszewski v. Dynamic Mariners Corp., Panama, supra,* 540 F.2d at 759[4]. Although the 1972 amendments specifically preclude an employee of an independent stevedoring contractor from bringing a suit against the vessel owner based upon the warranty of seaworthiness, nothing in the amendments is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known of a dangerous condition. *Bess v. Agromar Line,* 518 F.2d 738, 741 (4th Cir. 1975); House Report No. 92–1441, 92d Congress, 2d Session (1972), U.S. Code Cong. & Admin. News 1972, pp. 4698, 4703. Defendant owed no duty to warn plaintiff of a defect or danger which was known to plaintiff, or which was as well known to plaintiff as to defendant, or which was obvious, or which should have been observed by plaintiff in the exercise of ordinary care. *Cummings v. "Sidarma" Soc.,* 409 F.Supp. 869, 872[2] (E.D.La.1976); *Fedison v. Vessel Wislica,* 382 F.Supp. 4, 7 (E.D.La.1974).

But defendant did owe a duty to plaintiff to warn him of latent defects or dangers of which it knew or should have known, and it must take reasonable precautions to protect plaintiff and other invitees from dangers which are foreseeable from the use of the vessel. *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092, 1097[7] (D.Md.1975); *Kelleher v. Empresa Hondurena de Vapores, S.A., supra,* 129 Cal.Rptr. at 36.

 The evidence presented by plaintiff entitled the jury to pass upon the issues of whether defendant, through its periodic inspections of this barge, knew or in the exercise of reasonable care should have known of the rusted and defective latching mechanism; whether defendant should have realized that this defective latching mechanism involved an unreasonable risk of harm to plaintiff; and whether defendant should have expected that plaintiff would not discover or realize the danger. *Frasca v. Prudential-Grace Lines, Inc., supra,* 394 F.Supp. at 1101[18]. The trial court properly overruled defendant's motion for a directed verdict at the close of plaintiff's case.

Finding no error, we affirm the judgment.

McMILLIAN, P. J., and STEWART, J., concur.

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger."

Section 343 A continues:

"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."

Restatement, Second, Torts § 343, Comment a instructs that § 343 "should be read together with § 343 A, * * * ."

**3.** *See Griffith v. Wheeling Pittsburgh Steel Corporation,* 521 F.2d 31, 45 (3rd Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).